IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

KEITH A. WASHINGTON,

    Petitioner,

    v.                                 Civil Action No.: PWG-19-1696

DENISE GELSINGER, Warden,

    Respondent.

## **MEMORANDUM OPINION**

In response to this Petition for Writ of Habeas Corpus, Respondent asserts that the petition is subject to dismissal because the claim raised by Petitioner Keith A. Washington is without merit. ECF No. 6. Petitioner has filed a reply. ECF No. 9. No hearing is necessary to determine the matters pending before the Court. *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts* and Local Rule 105.6 (D. Md. 2021); *see also Fisher v. Lee*, 215 F.3d 438, 455 (4th Cir. 2000) (petitioner not entitled to a hearing under 28 U.S.C. §2254(e)(2)). For the reasons that follow, the Petition shall be denied and a certificate of appealability shall not issue.

## I.      BACKGROUND

Petitioner Keith A. Washington is an inmate who is presently incarcerated at Maryland Correctional Institution in Hagerstown. On February 25, 2008, following a jury trial in the Circuit Court for Prince George's County, Washington was convicted of involuntary manslaughter, first degree assault, and related handgun offenses. ECF No. 1 at 1-2. He was acquitted of other charges including second degree murder and voluntary manslaughter. He is currently serving a term of 45 years' incarceration. *Id.*

Washington, then an off duty police officer, was charged with second degree murder, voluntary manslaughter, involuntary manslaughter (unlawful act) and first degree assault of Brandon Clark, first degree assault of Robert White, and two counts of use of a handgun in the commission of felony. The charges arose when on January 24, 2007, the victims, Brandon Clark and Robert White, deliverymen for a furniture business, delivered bed rails to Washington's home. *Washington v. State*, 191 Md. App 48, 58 (2010). An altercation ensued which ended in Washington shooting Clark and White. *Id*. at 59-60. "White was severely injured and Clark died nine days later from complications related to his wounds." *Washington v. State*, 191 Md. App at 58. The State's theory of the case was that the shootings were "unprovoked and unjustified." *Id*. at 59. White testified that when they were in the bedroom of Washington's home, Washington became confrontational, pushing Clark, and as the men were leaving, Washington shot them both. *Id*. at 60-61. The defense's theory of the case was that Washington acted in self-defense. *Id*. at 61. Washington testified that he repeatedly demanded the deliverymen leave his house and then White and Clark suddenly began to punch and kick him. He testified that he feared the men, who were bigger than him, would either beat him to death or knock him unconscious and gain access to his service gun. He claimed that he shot them in self-defense. *Id*. at 62-65.

A.      **Relevant Pretrial Motions**

Prior to trial, the State filed a motion in *limine* to prohibit the defense from impeaching White's credibility with his eleven violent and non-violent criminal convictions. ECF No. 6-1 at 35-42. A hearing on the motion was held on December 19, 2007. ECF No. 6-5 at 4.

The prosecutor argued that White's convictions should be excluded from trial pursuant to Md. Rule 5-609--Impeachment by Evidence of Conviction of Crime--because the convictions were too old and/or not relevant to White's credibility. ECF No. 6-5 at 94-98. The defense argued that

White's 1993 grand-larceny and 1995 receiving stolen goods convictions were admissible as impeachment evidence under Md. Rule 5-609. ECF No. 6-5 at 98-99. Defense counsel conceded that some of White's violent convictions were older than 15 years and thus inadmissible under the Maryland Rule, but maintained that given Washington's right to due process and confrontation of witnesses, the defense should be able to use the convictions to show White's "bias and what his state of mind was when he was giving his version of events." ECF No. 6-5-at 99-104. Defense counsel also argued that White's convictions for burglary and assault with intent to commit sexual conduct involved concealment and secrecy and were therefore "relevant to Mr. White's credibility and should be allowed under 5-609." *Id*. at 105-06. Counsel did not argue that the convictions should be admitted to show White's propensity for violence pursuant to Md. Rule 5-404 or in order to establish that White was the initial aggressor in the incident under Md. Rule 5-405. ECF No. 6-5.

The parties also disputed whether the defense could impeach witness Kevin King with evidence of his prior criminal convictions and engaged in further legal arguments regarding the admissibility of convictions as impeachment evidence under the Maryland Rules. ECF No. 6-5 at 80-91.

After argument, the court granted in part and denied in part the State's motion. The court determined that White's earliest convictions, those that occurred in 1989 and 1991, were older than 15 years and therefore inadmissible under the Maryland Rule. ECF No. 6-1 at 36. The court further found that White's non-violent offenses for grand larceny, receiving stolen goods, and burglary could be used to impeach his credibility. ECF No. 6-1 at 36-39. As to White's more recent convictions for violent offenses, including pointing a firearm, assault and battery, assault with intent to commit sexual conduct, and domestic violence, the court found that these were not crimes

relevant to credibility and that their admission would unfairly prejudice the State, outweighing any impeachment value they had, therefore none of White's violent convictions could be used as impeachment evidence. ECF No. 6-1 at 37-42.

After jury selection and before the admission of evidence at trial, defense counsel filed a motion in *limine* to admit as impeachment evidence an incomplete list of White's convictions he provided to the grand jury. ECF No. 6-7 at 109-10. Counsel argued that White testified before the grand jury and provided a list of his convictions but omitted his 1995 conviction for first-degree burglary. ECF No. 6-7 at 110. Defense counsel sought permission to read the entire list of convictions White gave to the grand jury in order to impeach his credibility, arguing that White's omission constituted false testimony. *Id.* at 111-13. The trial court denied the motion, noting that it had already excluded some of White's convictions from being used as impeachment and that admitting the list would be "highly prejudicial" and would "outweigh any probative benefit." *Id*. at 114-15. Counsel then clarified that he wanted to "introduce what the actual questions and answers were in the grand jury so that [the defense] can show [White's] omission." *Id*. at 118. The court held that the defense had "the right to cross-examine on the issue of any inconsistent statement, if it were to take place, using the grand jury transcript. But for purposes of impeachment [counsel] can only ask [his] question and receive an appropriate response. You're not able to repeat verbatim, the question in front of the grand jury." *Id*. at 118.

## B.    <u>Trial Evidence</u>

The Court of Special Appeals of Maryland, on direct appeal, summarized the evidence presented at trial as follows:

> Appellant, who was, at that time, a Prince George's County police officer, and his wife, Stacey Washington ("Mrs. Washington"), purchased a bed from Marlo Furniture which was delivered to their Accokeek, Maryland home in December, 2006. The bed rails, however, were defective and either appellant or Mrs.

Washington requested replacements. Marlo agreed to do so and arrangements were made to deliver the new bed rails on January 24, 2007, between 2:30 and 5:30 pm. Appellant took off from work to be home when the delivery arrived. When the bed rails were not delivered during the specified time frame, appellant called Marlo to inquire about the delivery. After several phone calls, appellant was notified that the rails would be arriving around 7:30 p.m. At about that time, Brandon Clark ("Clark") and Robert White ("White"), two furniture deliverymen [("the deliverymen")], arrived at the Washington residence with the bed rails. Appellant met Clark at the door. Unbeknownst to Clark or White, appellant had a handgun tucked in to his waistband. White and Clark, accompanied by appellant carried the bed rails to the master bedroom on the second floor. They were alone; Mrs. Washington and the Washington's [sic] six year old daughter were having dinner in the first floor kitchen. A few minutes later, appellant shot both Clark and White. White was severely injured and Clark died nine days later from complications related to his wounds.

After an investigation by the Prince George's County Police Department, a grand jury sitting in the Circuit Court for Prince George's County indicted appellant on twelve counts:

| | |
|---|---|
| Count I | second degree felony murder (Brandon Clark); |
| Count II | second degree specific intent to kill murder (Brandon Clark); |
| Count III | second degree specific intent to do serious bodily harm murder (Brandon Clark); |
| Count IV | second degree depraved heart murder (Brandon Clark)[;] |
| Count V | voluntary manslaughter (Brandon Clark); |
| Count VI | involuntary manslaughter-grossly negligent act (Brandon Clark); |
| Count VII | involuntary manslaughter-unlawful act (Brandon Clark); |
| Count VIII | first degree assault (Brandon Clark); |
| Count IX | use of a handgun in the commission of a felony or crime of violence (Brandon Clark); |
| Count X | attempted second degree murder (Robert White); |
| Count XI | first degree assault (Robert White); |
| Count XII | use of a handgun in the commission of a felony or crime of violence (Robert White). |

Prior to appellant's trial, White filed a civil action against appellant and Prince George's County seeking $400,000,000 in damages arising out of the shooting.

Appellant's trial was preceded by *in limine* motions filed by both the State and appellant pertaining to evidentiary matters. Several of the trial court's rulings on these motions are pertinent to the issues raised on appeal and we will discuss them below.

While a detailed description of the evidence presented at trial is not necessary for this opinion, we will summarize the testimony of White, on the one hand, and appellant and Mrs. Washington, on the other, to illustrate the contrast in their version of events.

According to the State, the shootings were unprovoked and unjustified. The State introduced evidence from an employee of Marlo who had spoken to appellant earlier in the day to the effect that appellant was angry and hostile over the telephone. White testified that, upon arriving at appellant' residen[ce], Clark went up to the front door and talked to appellant, while White stayed in the delivery truck. White recounted that, when Clark came back to the truck to get the bed rails, he told White that appellant was "looking for a fight." White then testified as to his version of what then occurred;

> [THE WITNESS]: When we went inside, he direct [sic] us to a bedroom upstairs. I was walking first, in front of Brandon. Brandon was walking behind me. He was behind Brandon, and he directed us to a bedroom upstairs. We went in, we set the rails down, and then Mr. Washington started arguing with Brandon.

> [THE STATE]: And what was Mr. Washington arguing with Brandon about?

> [THE WITNESS]: Because, I guess, we got to his house late, and he was upset because he was waiting to [sic] his house all day.

> [THE STATE]: Go ahead and tell us what happened.

> [THE WITNESS]: So, Brandon kneeled down—I'm standing on the other side, close the railing, Brandon at the bed, and he ask [sic] Mr. Washington why you disassemble your bed, and he said-this was his words—"Motherfucker, are you telling me what to do in my house?" I said, "Brandon, do you know Mr. Washington?" Brandon said no.

> So it was few seconds later he pushed Brandon and told Brandon to get the fuck out of his house. I said, "Brandon, I think we should go." Brandon said, "No, just let me do my job. It's only going to take ten minutes."

> Brandon kneeling again—he's still kneeling. Mr. Washington pushed him again, "Get the fuck out of my house," and the third time he pushed him, he pushed him until he was actually laying on his side, Brandon jump up. I told Brandon, "That's it, we out of here". I stepped between both of them, Mr. Washington and Brandon, Brandon going back out the door with his hands up. I got back to

6

Mr. Washington, and all I heard was shots after we got out of the room. He said, "I know how to get you the fuck out of my house."

[THE STATE]: After you heard the shots, what did you do, what did you see?

[THE WITNESS]: Brandon was going back toward the stairs, and I grabbed Brandon to keep him from falling down the stairs.

\*\*\*\*

I had to lay him down, and as I ask [sic] him where the cell phone at, when I turn around, I heard more shots. Then I realized I was hit . . . [i]n the chest and in the stomach.

\*\*\*\*

I didn't want to go down the stairs because he already shot me. So I moved up, to move away from Brandon, …and I laid down here [pointing to a diagram], down on this side. Mr. Washington went back in his room. I got back up because I knew I needed help. When I got back up, he comes out of his room and he said, "Motherfucker, didn't I told you to stay down," and he starts shooting again. That's when I realized I was hit in the knee. I went down.

[THE STATE]: You went down. Then what happened?

[THE WITNESS]: We laid their screaming, asking him to help us, to call somebody, and he said he wasn't calling nobody.

In contrast, appellant and Mrs. Washington testified that appellant had acted in self-defense. Appellant testified that when Clark and White arrived at appellant's home he instructed them to put the bed rails in the foyer, but they carried them to the master bedroom instead. Appellant led Clark and White to the master bedroom, but when he got there, he noticed that White was no longer following. When appellant asked Clark about White's whereabouts, Clark "backslapped" appellant twice in the chest and told him, "I got him, Shorty."[1] Appellant then saw White coming out of appellant's daughter's bedroom. When appellant told White to get out of his daughter's bedroom, Clark again responded with "I told you, Shorty, I got him." Appellant told Clark and White to leave his house. After appellant told Clark and White for the third time to leave his house Clark responded that appellant needs to watch how he talked to people. Appellant again demanded that Clark and

---

[1]Appellant is 5'9". White is 6'2", and, at the time of the shooting, weighed 280 pounds; Clark was 6'7" and weighed 300 pounds.

White leave. He testified:

> [APPELLANT]: Mr. White punched me on the side of the face.

> [DEFENSE COUNSEL]: What did Mr. Clark do?

> [APPELLANT]: When he punched me, Mr. Clark punched me in the back of the head.

> [DEFENSE COUNSEL]: What did you do after Mr. White punched you and Mr. Clark punched you in the back of the head?

> [APPELLANT]: When he punched me, I swung around with my hand, and I just covered up because I couldn't stop them. They were on me.

> [DEFENSE COUNEL]: What position was your body in when you said you tried to cover up?

> [APPELLANT]: I was like this, covering up my head and my face and I was –

> [DEFENSE COUNSEL]: At this time, Your Honor I'd ask Mr. Washington to step down.

> [THE COURT]: Okay.

> (Witness steps down from the witness stand.)

> [DEFENSE COUNSEL]: You can stand in front of the jury. Now, Mr. Washington you said you attempted to cover up, and you described the position of your body. Can you let the ladies and gentlemen of the jury know, after Mr. Clark and Mr. White hit you, what you did physically?

> [APPELLANT]: Yeah, I swung around, with my hand like that, and they were on me and they was—I was covering up, like this, trying to protect my head and my face.

> [DEFENSE COUNSEL]: And at that point, where is Mr. Clark and Mr. White?

> [APPELLANT]: Mr. Clark is right here to my left, and Mr. White is right here to my right.

> [DEFENSE COUNSEL]: And what are they doing at that point?

[APPELLANT]: They were hitting me and kicking me.

Appellant went on to testify that he shot Clark and White in self-defense.

Mrs. Washington testified that she heard appellant, White and Clark going upstairs with the bed rails. She continued:

> I didn't hear anything for a little while, and then I heard my husband say, "Get out of my house, leave my house, get out now," and that's the next thing I heard.

> [DEFENSE COUNSEL]: And once you heard your husband say those words, what did you do?

> [MRS WASHINGTON]: I got up, I told [K.] [appellant's and Mrs. Washington's six year old daughter]—I told [K.] to stay put, to don't move, and that's when I got up. And I got up to see what was wrong, because I could tell something was wrong.
>
> ****
>
> [DEFENSE COUNSEL]: Okay Ms. Washington. You stated that you were walking from the kitchen as you were peering up the stairs. What did you see when you looked upstairs?

> [MRS. WASHINGTON]: That's when I saw Keith bent over, and these two men were on either side of him and they were beating him.

> [DEFENSE COUNSEL]: And when you looked up and saw that, what did you do? And you can take your time, Mrs. Washington.

> [MRS. WASHINGTON]: I was walking into the hallway and, as I was coming around through the hallway, I looked up and then I could see them, him in the middle, and he was kind of bent over, and then there was one man on either side of him, and they were beating him. And I thought oh, my god; oh, my god; they're just going to beat him to death, because he was just kind of bent over and he couldn't do anything. And I thought, okay, I need to help him; I need to help him. And so I was going to start up the steps. And as I was getting ready to start up the steps. I was thinking what if something happens to me what [K.] going to do? I didn't want her to come in here- (crying)
>
> ****
>
> [DEFENSE COUNSEL]: Ms. Washington, I think where we were, you were about to describe—I'll just ask you the question.

> As you looked upstairs, as you're leaving the kitchen, where were the deliverymen position[ed] with respect to where your husband, Keith Washington, was?
>
> [MRS. WASHINGTON]: He was bent over, and there was one man on either side of him.
>
> [DEFENSE COUNSEL]: I believe you said you were at the bottom of the stairs. At that point, when you looked upstairs and you were at the bottom of the stairs, what did you say or do?
>
> [MRS. WASHINGTON]: The first thing I thought was, my god; oh, my god, I need to help him.
>
> ****
>
> [MRS. WASHINGTON]: As I started to go up the steps, that's when I knew I couldn't help him. And then I was going to call 911. (Crying).

After the shooting, Mrs. Washington called 911. Appellant joined in the call. The state played a recording of the call to the jury. The State introduced forensic evidence regarding the gunshots. The evidence could support the conclusion that at least one of the gunshots was fired from a distance of four feet or more, while the other gunshots were at closer range. A DNA analysis of appellant's handgun indicated that both appellant's and White's DNA was present on it. The State also presented the testimony of an emergency room physician who treated appellant on the night of the shooting. She did not observe any trauma to appellant's neck or face. She also testified that the X-rays taken of appellant were negative, indicating no fractures. The emergency room nurse who examined appellant that night gave similar testimony. To further corroborate the physician's testimony, the State also introduced a photograph of appellant taken before he was transported to the hospital, which did not reveal any indication of significant injury.

Appellant called other witnesses who had been present at the Washington residence after the shooting. They testified that appellant's face appeared puffy or swollen on the night of the shooting and that appellant was holding an ice pack to his face before being transported to the hospital. The appellant called a forensic pathologist who testified that, in his opinion, White's testimony was not consistent with evidence regarding his injuries and Clark's autopsy.

ECF No. 1-2 at 3-10; *Washington v. State* 191 Md. App. 48, 58-65 (2010).

**C.**     <u>**White's Trial Testimony Regarding his Convictions**</u>

During White's cross-examination he admitted, when asked by defense counsel, that he had been convicted of grand larceny and first degree burglary, and did not recall whether he had been convicted of receiving stolen goods. ECF No. 6-8 at 175-76. White was also asked if he discussed his convictions before the grand jury and testified that no convictions had been omitted during his grand jury testimony. *Id.* at 176. When specifically asked whether the first-degree burglary conviction was omitted, White responded, "I don't know." *Id.* at 176-77. White's memory as to his grand jury testimony was refreshed by his reading his grand jury testimony to himself. *Id.* at 176-77. White then agreed that his testimony to the grand jury was false because he testified that the list of convictions was complete but the first-degree burglary was not mentioned. *Id.* at 177.

**D.**     <u>**Direct Appeal**</u>

On appeal, Washington raised the following claims of trial court error: (1) prohibiting Washington from introducing evidence of White's prior convictions for crimes of violence in order to demonstrate his violent propensities; (2) preventing Washington from cross-examining White about his failure to register as a sex offender in Maryland; (3) permitting the prosecution to elicit, as a present sense impression, the hearsay statement that Washington was "looking for a fight"; (4) denying Washington's motion for a mistrial when a State's witness testified that Washington was "hostile" on the telephone after the witness had been specifically instructed not to make such a statement; (5) failing to sustain Washington's objection to the prosecutor's allegedly improper remark made during opening statement; (6) denying Washington's motion for a mistrial based on the prosecutor's allegedly improper remarks made during closing argument; and (7) denying Washington's motion for a new trial filed pursuant to Md. Rule 4-331(n). *Washington v. State*, 191

Md. App. 48, 57 (2010). The Court of Special Appeals affirmed the judgment in a reported opinion filed January 29, 2010. *Id.*

With respect to Washington's first claim regarding the introduction of White's prior convictions for crimes of violence in order to demonstrate his violent propensities, the Court of Special Appeals held that Washington had waived this issue because he did not argue to the trial judge that White's prior convictions for violent crimes were admissible to show that White was the initial aggressor—an essential element of self-defense. *Washington* 191 Md. App. 66-80. The Court of Special Appeals declined to decide Washington's related claim that trial counsel was ineffective for failing to make the correct argument regarding admission of White's prior convictions of crimes of violence, determining that the record was insufficient to determine whether defense counsel's decision was "lawyerly dereliction or may have reflected a tactical consideration by trial counsel." *Id.* at 72. The court found that "the appropriate avenue for the resolution of the claim of ineffective assistance of counsel [was] a post-conviction proceeding. *Id.*

Washington's March 1, 2010, Motion for Reconsideration was denied on March 31, 2020. ECF No. 6-1 at 24. Washington's timely petition for writ of certiorari was denied by the Court of Appeals on June 21, 2010. *Washington v. State*, 415 Md. 43 (2010) (Table); ECF No. 6-1 at 24-25.

E.   **Post-Conviction Proceedings**

On March 22, 2011, Washington initiated post-conviction proceedings by filing a petition under Maryland's Uniform Postconviction Procedure Act ("UPPA"), Md. Code Ann., Crim. Proc. § 7-101 *et seq.* ECF No. 6-1 at 25.

Among 23 claims advanced by Washington, he alleged that trial counsel had been constitutionally ineffective for failing to: (1) call additional witnesses who would have testified

about Washington's injuries; (2) call a use of force expert to establish that Washington used a reasonable and necessary amount of force in self-defense; (3) call an expert in shell casing expulsion to testify regarding the manner in which Washington's gun ejected spent casings and the significance of the locations where the casings were recovered; (4) argue that White's prior convictions for violent crimes were admissible to show that he was the initial aggressor during the incident; (5) properly cross-examine While; and (6) show White's violent character. ECF No. 1-4 at 8-10; ECF No. 6-17 at 10-11.

After hearings held on March 20 and 21, 2013, the postconviction court, in a Memorandum Opinion and Order dated August 27, 2013, denied postconviction relief on all grounds, with the exception of granting Washington 90 days in which to file a belated Application for Review of Sentence. ECF No. 6-1 at 29-30.

Michael Starr, one of Washington's two trial attorneys testified at the postconviction hearing. ECF No. 6-18 at 65. He explained that his primary theory of defense was that "Mr. Washington was acting in defense of himself, his family, and his home." *Id*. at 68.

In response to the inquiry as to whether he had any "pressing concerns" regarding evidence in the case, Starr testified that he was concerned that the evidence showed that Washington did not have injuries consistent with the type of assault he described (*id*. at 68) and that he was also concerned that the State had evidence of Washington's irrational and angry conduct and he did not want to open the door to that evidence being admitted.

> [TRIAL COUNSEL]: The other one that comes to mind is that the State had in its back pocket, so to speak, a number of witnesses who had had encounters with Mr. Washington and said that he had become either violent or irrationally angry under strange circumstances, and they were strangers to him; they didn't know each other.
>
> [THE STATE]: So when you say that the State had that in its back pocket, how did that impact your approach to this case?

[TRIAL COUNSEL]: Well, one of our paramount concerns became not doing anything that would open the door to any ruling, a right ruling or a wrong ruling, that the State could present those witnesses. Our theory and one of our goals in this trial was to narrow the State's case so that Robert White was the only person who was accusing Mr. Washington of having committed a crime or having acted irrationally.

So we were always aware of potentially opening that door, as they say, and we were focus[]ed on not going anywhere near that door.

[THE STATE]: What would have been the impact on the defense if witnesses had testified that Mr. Washington had been irrational, violent on other occasions?

[TRIAL COUNSEL]: Our assessment was that it would have been devastating. It's a much different case -- we believed very strongly in our attacks on Mr. White's credibility and in Mr. Washington's testimony and the testimony of his wife and the inconsistencies between Mr. White's testimony and other evidence. So to throw into the mix other people saying that Mr. Washington had behaved violently or irrationally would have been devastating, and this is the defense that [co-counsel] and I and Mr. Washington came up with.

ECF No. 6-18 at 68-69. As to his approach for cross-examining White, Starr explained that:

The theory for cross-examining Mr. White was to highlight what we believed were some very strong attacks on his credibility. He had tested positive for cocaine, something that he denied inexplicably. He had a prior criminal record, and he had also released a statement to the media before he had ever told his version of events to law enforcement. And Mr. White had filed a civil lawsuit against Mr. Washington and, I believe, against Prince George's County. So we wanted to lead with those points, not do anything that would detract from them, and also elicit testimony from Mr. White that we believed we could disprove with other testimony or evidence throughout the course of the trial.

ECF No. 6-18 at 70-71.

As to the failure to argue White's violent convictions were admissible on the basis that they

showed he was the initial aggressor, trial counsel explained:

[THE STATE]: Did you make any attempt to try to get [White's] violent convictions admitted?

[TRIAL COUNSEL]: Yes, we moved for their admission. There may have even been in limine motions with respect to this, either a State motion to preclude or a defense motion to admit. But I recall us fighting for the admission of all of Mr. White's prior convictions, specifically the violent ones.

14

[THE STATE]: It appears from the record that you did not seek to admit them on the specific ground that it would show that he was the initial aggressor. Was there a reason for that?

[TRIAL COUNSEL]: Well, one of the things that I know -- and I testified about this earlier, what we were concerned about was eliciting any evidence or making any argument that would allow the [c]ourt to rule, properly or improperly, that the door had been opened to other conduct by Mr. Washington outside the scope of the case.

One thing that we were very focus[]ed on was not wanting there to be some moment in the trial -- because this would have blown our defense out of the water -- not wanting there to be some moment in the trial where the Judge says, well, now that that's been admitted into evidence, what's good for the goose is good for the gander, and here comes this parade of damaging witnesses that otherwise would not have come in. We fought very hard to get those convictions admitted.

[THE STATE]: Is that specifically why you didn't make a proffer of White's violent convictions on the grounds of initial aggressor?

\* \* \*

[TRIAL COUNSEL]: That is my best recollection of why we did it, yes.

ECF No. 6-18 at 83-84.

Regarding Washington's claim that trial counsel erred in not calling a use-of-force expert,

trial counsel again explained:

[THE STATE]: Did you have any concern that calling a use-of-force expert might open the door to prior instances on the job where Mr. Washington used improper force?

\* \* \*

[TRIAL COUNSEL]: We were thinking constantly about opening that door and not doing anything to open that door. And really, again, whether the door would have been properly opened or not wasn't even the primary concern. It was whether we risked a State's argument that the door had been opened and an argument that the Court may accept. Once it's in, it's in, and we were trying to win this trial.

So, yes, we were always concerned about opening that door because our defense was focus[]ed on narrowing the State's case to the credibility of Robert White, and if other people who didn't know Mr. White and didn't know each other testified -- and I think someone did at the sentencing -- that Mr. Washington had behaved violently or irrationally in random encounters with them, it would detract mightily from our defense.

15

[THE STATE]: And why not simply trust that the appellate process would right any wrong, if a judge made a wrong ruling letting character evidence in?

[TRIAL COUNSEL]: Well, I don't have anything statistical to back this up, but I think your better chances are being acquitted in the first instance. Again, once that door is opened, we believed that Mr. Washington would have been convicted and he would have been incarcerated and waiting out the appellate process.

Unfortunately, it turned out that way anyway, but that's what we were trying to avoid.

[THE STATE]: And are you aware that he had had internal affairs problems with improper use of force on the job prior to this event[?]

* * *

[TRIAL COUNSEL]: We were aware of Mr. Washington's entire history, professionally, and we were aware of these witnesses that the State was hoping they'd have the opportunity to call, yes.

ECF No. 6-18 at 95-97. Starr further testified that he was aware of Md. Rule 5-404(a) which generally prohibits the admission of evidence of a person's character to "show action and conformity therewith." ECF No. 6-18 at 111. When asked if there was an exception to the rule for "evidence of a pertinent character trait of an accused offered by the accused or by the prosecution to rebut the same" Starr stated that he did not have the rule in front of him but did not "take issue with your reading of it." ECF No. 6-18 at 111. Further, Starr conceded that in not calling a use of force expert he was partially attempting to "guard[] against an erroneous ruling" by the trial court. ECF No. 6-18 at 111-12. He offered additional testimony as to his concern that character evidence would be admitted against Washington because the "door can be opened, and there is no doubt about that. There is a theory under which it could be admissible. If we offered good character, then the State would be [in] a stronger position to offer bad character." ECF No. 6-18 at 112.

Starr also offered that he tried to get all of White's violent convictions into evidence (ECF No. 6-18 at 124-25) but when asked whether he presented all available legal theories to get the

16

convictions into evidence, he responded; "Well, we would have researched those issues and presented legal theor[ies] to get them into evidence. I don't know whether you always present all conceivable theor[ies]." *Id*. at 125.

At the conclusion of the hearing, post-conviction counsel argued that Md. Rule 5-404(b) applied only to defendants, not witnesses, and that White's violent history was "highly probative of the issue of who attacked first." *Id*. at 162-63. The State responded that post-conviction counsel mischaracterized the law because subsection (a) of Md. Rule 5-404 rather than subsection (b) governed. *Id*. at 185. Md. Rule 5-404(a) provides that "evidence of first aggressor can only be introduced as reputation or opinion evidence. It cannot be introduced as specific instances . . . of prior misconduct[.]" *Id*. at 185.

In denying postconviction relief on the ineffective assistance of counsel claim, the postconviction court set out the proper standard of review under *Strickland v. Washington*, 466 U.S. 668 (1984). ECF 1-4 at 10-11. Relying on Maryland case law, the postconviction court agreed with the State that pursuant to Md. Rule 5-404(a), "counsel [was] precluded from introducing specific instances of White's past conduct inasmuch as [Washington] had no knowledge of White's prior violent behavior on the night of January 24, 2007, and White was the surviving victim." ECF 1-4 at 12. The postconviction court found that under the rule, Washington was not "permitted to introduce White's prior criminal record for the purpose of showing White was the initial aggressor." ECF 1-4 at 13. The postconviction also held:

> The verdict support[ed] a conclusion that the jury largely discounted White's testimony. Had the jury found White's testimony credible, they likely would have convicted [Washington] of second degree murder or voluntary manslaughter. Rather, the verdict support[ed] the conclusion that the jury did not believe that [Washington] met the elements of perfect self-defense.

ECF No. 1-4 at 13-14. In determining that trial counsel was not ineffective in his handling of White's testimony and his violent criminal history, the postconviction court held that the "defense made a sound strategic decision not to emphasize White's character for violence as it would open the door to [Washington's] character for violence and the State's rebuttal witnesses, possibly resulting in a less favorable verdict." ECF No. 1-4 at 14.

Washington filed a timely application for leave to appeal. ECF No. 6-1 at 31. In the application, Washington alleged that trial counsel provided constitutionally ineffective assistance by failing to: (1) call emergency medical technician David Joran, Jr., as a witness; (2) call an expert in the field of use of force; (3) call an expert in the field of shell casing expulsion; and (4) offer evidence of White's prior conviction for violent crimes to prove his violent nature and that he was the aggressor in the incident. ECF No. 1-2 at 2. On August 31, 2018, after briefing and oral argument, the Court of Special Appeals affirmed the judgment of the post-conviction court in an unreported opinion. *Washington v. State*, No. 1645, Sept. Term, 2013; ECF No. 1-2; ECF No. 6-1 at 34. Washington's Motion for Reconsideration was denied by the court on October 5, 2018. ECF No. 6-1 at 34. The court's mandate issued the same day. *Id*.

The Court of Special Appeals rejected Washington's ineffective assistance of counsel claim regarding the use of White's violent prior offenses. First, the court, set forth the proper standard under *Strickland* and then concluded that neither subsection of Md. Rule 5-404 would have permitted the prosecutor to introduce evidence of Washington's character of violence or anger simply because defense counsel introduced White's character for violence. ECF No. 1-2 at 12-14, 19-20. The court held that defense counsel "misinterpreted Rule 5-404 as permitting the admission of [Washington's] prior violent crimes or acts if [the defense] introduced White's prior convictions for the purpose of proving that he was the first aggressor" and his fear of opening the

door to Washington's character for violence was not justified. ECF No. 1-2 at 19-20. The Court of

Special Appeals nevertheless determined that trial counsel's performance was not deficient:

> Counsel's trial strategy was to focus on attacking White's credibility, which was
> done in a variety of ways. Counsel had a fear that by attempting to show that White
> was the initial aggressor through the admission of his prior violent convictions,
> counsel would have opened the door for the State to argue for the admission of
> evidence regarding [Washington's] character for violence, and the court could have
> accepted such argument given that the State had a number of witnesses ready to
> testify for this very purpose. The admission of evidence of [Washington's] prior
> violent or irrational acts would have been, in the trial counsel's opinion,
> "devastating" to [Washington's] defense. We cannot say that trial counsel's desire
> to avoid even the possibility of the trial court admitting such character evidence
> regarding appellant was unreasonable.

ECF 1-2 at 21. The Court of Special Appeals also found that even if counsel's performance was

deficient, counsel's conduct did not prejudice Washington because:

> the jury's verdict largely showed that it discredited White's testimony by acquitting
> [Washington] on the charges of second-degree murder and voluntary manslaughter.
> In other words, the jury's verdict indicated that it believed that White was the initial
> aggressor but found that [Washington] did not use a reasonable amount of force in
> defending himself. Thus there is not a reasonable probability that the admission of
> White's prior convictions to show his violent nature would have changed the result
> of appellant's trial.

ECF No. 1-2 at 21-22.

Washington filed a timely Petition for Writ of Certiorari in the Court of Appeals of

Maryland. ECF No. 6-1 at 34. On December 20, 2018, the Court of Appeals denied the petition.

*Washington v. State*, No. 360, Sept. Term. 2018; ECF No. 6-1 at 34.

### F.    **Federal Habeas Petition**

Washington, who is proceeding with counsel, timely filed his Petition on June 7, 2019.

ECF No. 1. His sole claim is that "trial counsel provided constitutionally ineffective assistance by

failing to introduce into evidence complaining witness Robert White's prior convictions for violent

crimes to prove his violent nature and that he was the aggressor during the incident." ECF No. 1

at 5. Respondent filed its Response to the Petition arguing that Washington is not entitled to relief. ECF No. 6. Washington has replied. ECF No. 9.

## II.     DISCUSSION

### A.     <u>Standard of Review</u>

An application for writ of habeas corpus may be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). The federal habeas statute at 28 U.S.C. § 2254 sets forth a "highly deferential standard for evaluating state-court rulings" *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997); *see also Bell v. Cone*, 543 U.S. 447 (2005). The standard is "difficult to meet," and requires courts to give state-court decisions the benefit of the doubt. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotation marks and citations omitted); *see also White v. Woodall,* 572 U.S.415, 419-20 (2014), quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011) (state prisoner must show state court ruling on claim presented in federal court was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement.").

A federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits: 1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States"; or 2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state adjudication is contrary to clearly established federal law under § 2254(d)(1) where the state court 1) "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or 2) "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000);

*see Barnes v. Joyner*, 751 F.3d 229, 238 (4th Cir. 2014); *Lovitt v. True*, 403 F.3d 171, 178 (4th Cir. 2005).

Under the "unreasonable application" analysis under 2254(d)(1), a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Thus, "an unreasonable application of federal law is different from an incorrect application of federal law." *Id.* at 785 (internal quotation marks omitted).

Further, under § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). "[E]ven if reasonable minds reviewing the record might disagree about the finding in question," a federal habeas court may not conclude that the state court decision was based on an unreasonable determination of the facts. *Id.* "[A] federal habeas court may not issue the writ simply because [it] concludes in its independent judgment that the relevant state-court decision applied established federal law erroneously or incorrectly." *Renico v. Lett,* 559 U.S 766, 773 (2010). Rather, the state court's application of federal law must be unreasonable, not merely incorrect. *Lovitt*, 403 F.3d at 178; *see Barnes*, 751 F.3d at 238-39 (state court's decision is an unreasonable application of clearly established federal law when the state court identifies the correct governing principle but unreasonably applies that principle to the facts).

The habeas statute provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "Where the state court conducted an evidentiary hearing and explained its reasoning with some care, it should be

particularly difficult to establish clear and convincing evidence of error on the state court's part." *Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010). This is especially true where state courts have "resolved issues like witness credibility, which are 'factual determinations' for purposes of Section 2254(e)(1)." *Id*. at 379.

Where, as here, a petitioner alleges a claim of ineffective assistance of counsel, he must show that counsel's performance was deficient, and the deficiency prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

With regard to the first prong, the petitioner must demonstrate that his attorney's performance fell "below an objective standard of reasonableness." *Id.* at 688; *see Harrington*, 562 U.S. at 104. The central question is whether "an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington*, 562 U.S. at 88 (quoting *Strickland*, 466 U.S. at 690). The Supreme Court explains that the "first prong sets a high bar." *Buck v. Davis*, ___ U.S. ___, 137 S.Ct. 759, 775 (2017). Notably, a "lawyer has discharged his constitutional responsibility so long as his decisions fall within the wide range of professionally competent assistance." *Id.* (internal quotation and citation omitted). The standard for assessing such competence is "highly deferential" and there is a "strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 669. Consequently, the performance prong is "'difficult'" to establish. *Lawrence v. Branker*, 517 F.3d 700, 709 (4th Cir. 2008) (quoting *James v. Harrison*, 389 F.3d 450, 457 (4th Cir. 2004)).

To satisfy the high bar, the burden is on the petitioner to establish "'that counsel made errors so serious that his "counsel" was not functioning as the "counsel" guaranteed by the Sixth Amendment.'" *Harrington*, 562 U.S. at 88 (quoting *Strickland*, 466 U.S. at 687). Notably, "the

*Strickland* standard must be applied with scrupulous care," *Harrington*, 562 U.S. at 105, and "the standard of judging counsel's representation is a most deferential one." *Id.* Indeed, "[k]eenly aware of the difficulties inherent in evaluating counsel's performance, the Supreme Court has admonished that courts 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Lawrence*, 517 F.3d at 708 (quoting *Strickland,* 446 U.S. at 689); *see Cullen*, 563 U.S. at 189 (2011); *Harrington*, 562 U.S. at 104; *Lee v. Clarke*, 781 F.3d 114, 122 (4th Cir. 2015).

Second, to satisfy the "prejudice prong," a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 446 U.S. at 694; *see also Buck*, 137 S. Ct. at 776. "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceedings. *Strickland*, 466 U.S. at 687. A petitioner alleging ineffective assistance of counsel must show that the proceeding was rendered fundamentally unfair by counsel's affirmative omissions or errors. *Id*. Thus, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. A petitioner is not entitled to post-conviction relief where the record establishes that it is "not reasonably likely that [the alleged error] would have made any difference in light of all the other evidence of guilt." *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010).

In evaluating whether the petitioner has satisfied the two-pronged test set forth in *Strickland*, a court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 U.S. at 697. Nor must a court address both components if one is dispositive. *Jones*

*v. Clarke*, 783 F.3d 987, 991 (4th Cir. 2015). This is because failure to satisfy either prong is fatal to a petitioner's claim. As a result, "there is no reason for a court . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697.

Absent clear and convincing evidence to the contrary, a claim that counsel's decision was premised on trial strategy cannot be disturbed. *See Evans v. Thompson*, 881 F.2d 117, 125 (4th Cir. 1989). A defendant must overcome the "'strong presumption' that counsel's strategy and tactics fall 'within the wide range of reasonable professional assistance.'" *Burch v. Corcoran*, 273 F.3d 577, 588 (4th Cir. 2001) (quoting *Strickland*, 466 U.S. at 689). "There is a strong presumption that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than sheer neglect." *Harrington*, 562 U.S. at 109. (internal quotation marks and citation omitted). Under the Sixth Amendment, a defendant "has a right to effective representation, not a right to an attorney who performs his duties 'mistake-free.'" *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1910 (2017) (quoting *United States v. Gonzalez-Lopez*, 548 U.S. 140, 147 (2006)). Further, "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Harrington*, 532 U.S. at 105 (internal citations omitted). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id*.

### III.   Discussion

There is no dispute that trial counsel sought admission of White's violent convictions solely to impeach his credibility and/or bias and failed to offer those convictions to prove his violent nature or that he was the aggressor. The gravamen of petitioner's claim is that the Maryland Court of Special Appeals unreasonably applied *Strickland* in light of the record. Washington argues that

the Maryland Court of Special Appeals applied *Strickland* in an objectively unreasonable manner by failing to conclude that trial counsel's failure to introduce evidence of White's violent crimes fell below acceptable professional norms and prejudiced his defense. Washington contends that the state court's adjudication of the ineffective assistance claim was unreasonable. I disagree.

The state court's determination that Starr's conduct was not ineffective as well as its assessment that Washington failed to demonstrate prejudice arising from Starr's alleged deficient conduct survives review. Washington is unable to demonstrate either deficient performance on behalf of his trial counsel or prejudice arising from his counsels' allegedly inadequate argument regarding the admission of White's violent crimes. Washington presents no evidence that if counsel were aware that the evidence of White's violent crimes were admissible that counsel would have pursued their admission for that purpose. The trial transcript demonstrates that trial counsel thoroughly impeached White's credibility at trial and counsel testified that he did not wish to draw attention to who was the aggressor in the incident but rather desired to focus on the unbelievability of White based on his inherent unreliability *e.g.* his criminal convictions, conflicting testimony, pecuniary interest in the outcome of the trial, as well as on his version of events not matching the forensic evidence produced at trial. Trial counsel testified that the defense wished to avoid any evidence that implicated Washington's character or previous violent and irrational outbursts.

Under *Strickland*, counsel is permitted to "make a reasonable decision that makes particular investigations unnecessary." *Strickland* 466 U.S. at 691. Here, a reasonable attorney could decide to forgo further inquiry into the admissibility of White's violent crimes based upon the determination that the focus of the defense was on undermining White's credibility. "Counsel [is] entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Harrington*, 562 U.S. at 107.

Additionally, trial counsel's decisions regarding which witnesses to call at trial and how properly to examine them are entitled to substantial deference under *Strickland*. *See Bunch v. Thompson*, 949 F.2d 1354, 1364 (4th Cir. 1991) (choice of witnesses is a tactical decision to be made by trial counsel); *Stamper v. Muncie*, 944 F.2d 170, 178 (4th Cir. 1991) (challenge to counsel's trial decisions and/or tactics amounted to no more than "Monday morning quarter-backing.").

Petitioner relies on cases such as *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986); *Williams v. Taylor*, 529 U.S. 362, 395 (2000); and *Hinton v. Alabama*, 134 S.Ct. 1081, 1089 (2014) to support his claim that trial counsel's mistake of law cannot be excused. Petitioner relies on these cases for the proposition that when defense counsel's decision is based on an unreasonable mistake of law, the decision constitutes deficient performance and may not be justified as strategy. I disagree. The principle holdings of the cases cited by Petitioner is instead that a failure to properly investigate and prepare for trial cannot be a valid trial strategy. The facts and holdings of the cited cases are sufficiently different from the facts in Petitioner's case that they do not constitute clear Supreme Court precedent with which the Maryland court's decision is in contravention.

*Kimmelman* concerned trial counsel's complete failure to conduct pre-trial discovery, a failure for which "counsel offered only implausible explanations." 777 U.S. at 385-86. While the Supreme Court characterized counsels' justifications for his failure to conduct discovery, as "a startling ignorance of the law—or a weak attempt to shift blame for inadequate preparation," the holding of the Court makes plain that it was the complete failure of trial counsel to investigate or make a reasonable decision not to investigate that made his performance deficient and that his ignorance of the law could not be used to excuse that conduct. *Id*. at 385-86.

26

*Hinton* concerned trial counsel's mistaken belief that he had received all the funding he was entitled to under state law and therefore he did not seek additional funding to replace an expert he knew was inadequate. 571 U.S. at 274. As in *Kimmelman*, the mistake of counsel in *Hinton* did not involve any trial strategy but rather was a failure of trial preparation due to a mistake regarding the law.

Counsel's error in *Williams* also involved a failure to investigate. Counsel in *Williams* did not begin preparing for trial until a week before trial and failed to conduct an investigation that would have discovered records of his client's horrific childhood. 529 U.S. at 395. The failure to prepare in *Williams*, was not due to any strategic trial strategy but due to counsel's mistaken belief that he could not access the records under state law. *Id*.

Counsels' mistakes of law in the cases relied upon by Petitioner resulted in the failure to properly investigate, decisions by counsel which had no conceivable benefit to any of the Defendants. Decisions to not seek discovery, records, or a substitute expert had no upside to any of the Defendants in the cases relied upon by Petitioner. Here, counsel's decision was based, in part, on the strategic avoidance of any misapplication of the law and damaging evidence coming in and harming Petitioner's case. Further, unlike counsel in the cases relied upon by Petitioner, counsel in Washington's case testified regarding his overall strategy for addressing White as a witness. In short, the state court's findings are not contrary to Supreme Court precedent. *See Morva v. Zook*, 821 F. 3d 517, 524 (4th Cir. 2016) (holding "when the Supreme Court has not yet confronted the specific question presented by a particular case, the state court's decision cannot be 'contrary to' any holding of the Supreme Court.")

There is simply no indication that the state court's determination "was so lacking in justification that there was an error...beyond any possibility for fairminded disagreement."

*Harrington* 562 U.S. at 103; *see also Green v. Johnson,* 116 F. 3d, 115, 1122 (5th Cir. 1997) (holding even if trial counsel erred in determining that testimony would have opened the door to additional incriminating evidence, that error alone does not rise to a constitutional ineffectiveness claim where the decision was a conscious and informed tactical one); *Krecht v. United States*, 846 F. Supp. 2d 1268, 1287 (S.D. Fla. 2012) (holding even where "counsel's strategy is the result of ignorance of the law, his actions may nonetheless fail to amount to deficient performance under *Strickland* if a hypothetical reasonable counsel in his position may still have made the same decision."); *Jones v. Suthers*, 130 Fed. Appx 235, 241-42 (10th Cir. 2005) (holding counsel's decision not to call a rebuttal expert witness for fear that the expert would open the door to prior allegations lodged against Defendant, even though state evidentiary rules would not have permitted the "door" to be opened, was trial strategy and the decision not deficient).

Similarly, Petitioner's contention that the Maryland Court of Special Appeals' decision was also "'contrary to' Supreme Court precedent that State trial judges are presumed to know and apply correctly the law" (ECF No. 1-1 at 20) is also unavailing as even where a state court failed to follow a state rule, such an action does not constitute an interpretation of a substantive constitutional or federal law that can be vindicated through federal habeas relief.

The state court's findings that trial counsel's conduct was not deficient are objectively reasonable given the testimony put forth at the postconviction hearing, and are supported by the pretrial motions, trial, and postconviction transcripts. The findings are objectively reasonable, deemed presumptively correct pursuant to 28 U.S.C. §§2254(d) and (e), and are not contrary to Supreme Court precedent.

Even if the undersigned found trial counsel's conduct to be deficient, Washington would nevertheless not be entitled to relief as he has not established prejudice arising from the conduct

of trial counsel. Petitioner contends that the Court of Special Appeals' determination that trial counsel's performance was not prejudicial because the jury's verdict appeared to discredit White's testimony, constitutes "wild speculation and thus [application of] the prejudice prong of *Strickland* in an objectively unreasonable manner." ECF No. 1-1 at 26-27.

In regard to the prejudice prong, the Court of Special Appeals found that the jury's verdict showed it disbelieved White's testimony in its acquittal of Washington on the second-degree murder and voluntary manslaughter charges. The court opined that the jury's verdict suggested that it believed White was the initial aggressor, but Washington did not use a reasonable amount of force in defending himself. Therefore, the court held, there was not a reasonable probability that the admission of White's prior convictions to show his violent nature would have changed the result of the trial. ECF No. 1-2 at 21-22.

The court's findings are supported by the record. If the jury believed White's version of events, that Washington became irate and shot the two men because they were late in their delivery, then Washington was clearly guilty of second-degree murder or voluntary manslaughter. The jury did not find Washington guilty of either offense. It is also clear that the jury did not fully believe Washington's perfect self-defense theory of the case either. Had the jury fully believed Washington he would have been acquitted of all offenses because he would have been justified in shooting the two deliverymen. Instead, the jury reasonably concluded that White was the aggressor but Washington did not use a reasonable amount of force to defend himself thus they convicted him of involuntary manslaughter.

Washington contends that another explanation for the jury's verdict is that they could have found he intended to seriously injure the delivery men rather than kill them thus satisfying the *mens rea* requirement for assault but not for second-degree murder or voluntary manslaughter. But

second-degree murder under Maryland law does not require a showing of intent to kill, *Alston v. State*, 414 Md. 92, 116-17 (2010) (holding the "intent to inflict grievous bodily injury" variety of second-degree murder does not involve an intent to kill). The jury was explicitly instructed to that effect: second degree murder involves "the killing of another person with either the intent to kill or the intent to inflict such serious bodily harm that death would be the likely result." ECF No. 6-14 at 26-27.

Clearly, the weight of the evidence before the jury demonstrated that Washington satisfied the *mens rea* for second-degree murder in that he intended to inflict grievous bodily injury which would likely result in death when he shot each victim multiple times in their vital organs. ECF No. 6-9 at 80, 83-84. It is reasonable therefore that the jury acquitted Washington of the second degree murder charge because it did not believe White's testimony that Washington was the aggressor and shot without provocation. It is a reasonable determination that the jury considered the proportionality of Washington's response to the fight started by the deliverymen and concluded that he defended himself with excessive force relative to the attack and was therefore guilty of involuntary manslaughter and assault. Further evidence regarding initial aggressor status would not have changed this determination by the jury and therefore Washington was not prejudiced by counsel's conduct.

Lastly, even if the undersigned found trial counsel's conduct to be deficient or that Washington was prejudiced by counsel's conduct, Washington is nevertheless not entitled to relief. "The pivotal question [in a § 2254 petition] is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Id.* at 785. There is simply no indication that the state court's determination that Washington was not prejudiced by counsel's conduct "was so lacking in

justification that there was an error...beyond any possibility for fairminded disagreement." *Harrington* 562 U.S. at 103. As noted above, the state court identified the appropriate federal law as established by the Supreme Court for determining ineffective assistance of counsel claims and applied it in a manner that was not contrary to or unreasonable to that Supreme Court precedent.

In sum, the state court found that Washington was not entitled to relief as the record established that it was "not reasonably likely that [the alleged error] would have made any difference." *Berghuis*, 560 U.S. at 390. This ruling was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement." *Harrington*, 562 U.S. at 103. This Court "must presume that the state court's factual findings are correct unless the petitioner rebuts those facts by clear and convincing evidence," and this Court "cannot disturb the state court's ruling simply because it is incorrect; it must also be **unreasonable**." *Nicolas v. Atty. Gen. of Maryland*, 820 F.3d 124, 129 (4th Cir. 2016) (emphasis added); *see also Harrington*, 562 U.S. at 100-01; 28 U.S.C. § 2254(e)(1). Washington does not meet his burden. Under the deferential standard accorded to state court rulings on federal habeas review, the state court's rejection of Washington's ineffective assistance of counsel claim constituted a reasonable application of *Strickland*. In light of the record, there is no basis to find that the state court's determinations were unreasonable on the facts or on the law. There is no cause to disturb the post-conviction court decision under § 2254(d).[1]

## CONCLUSION

Having found that the Petition for Writ of Habeas Corpus does not present a claim upon which federal habeas relief may be awarded, this Court must consider whether a certificate of

---

[1] Having so found, the Court does not reach Respondent's additional argument that trial counsel's performance was neither deficient nor prejudicial under *Strickland* on grounds not expressed by the Court of Special Appeals (see ECF No. 6 at 68-95), and declines the invitation to review the matter de novo.

appealability should issue. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see Buck*, 137 S.Ct. at 773. The petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (citation and internal quotation marks omitted), or that "the issues presented are adequate to deserve encouragement to proceed further," *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Because this Court finds that there has been no substantial showing of the denial of a constitutional right, a certificate of appealability shall be denied. *See* 28 U.S.C. § 2253(c)(2). Washington may still request that the United States Court of Appeals for the Fourth Circuit issue such a certificate. *See Lyons v. Lee*, 316 F.3d 528, 532 (4th Cir. 2003) (considering whether to grant a certificate of appealability after the district court declined to issue one).

A separate Order follows.

`

 9/13/2022                             _____/s/_____
Date                                   Paul W. Grimm
                                       United States District Judge